UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re: | ) | BK No.:  11-15354 |
| | ) | |
| CHAMPION ENVIRONMENTAL | ) | Chapter: 11 |
| SERVICES, INC., | ) | Honorable A. Benjamin Goldgar |
| | ) | |
| | ) | |
| Debtor(s) | ) | |

INTERIM ORDER AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL;
(B) INCUR POST-PETITION DEBT; AND (C) GRANT ADEQUATE
PROTECTION AND PROVIDE SECURITY TO FIRSTMERIT BANK, N.A.

Upon the motion (the "Motion") of Champion Environmental Services, Inc., as debtor and debtor-in-possession ("Debtor"), for the entry of an interim order (this "Interim Order"), pursuant to sections 363, 364(c), and 364(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing it to use cash collateral and obtain post-petition financing by entering into a Postpetition Senior Secured Loan Agreement, which agreement is attached hereto as Exhibit A (the "Postpetition Loan Agreement"), with FirstMerit Bank, N.A. ("Lender"), proper notice as required by Rule 4001(b) of the Federal Rules of Bankruptcy Procedure having been provided under the circumstances; this Court having determined that Debtor's use of cash collateral and receipt of post-petition financing to cover the expenditures set forth in the Budget (as defined below) are necessary to avoid immediate and irreparable harm to Debtor's estate pending a final hearing on the Motion; and upon the proceedings held before this Court on April 20, 2011 (the "Interim Hearing"), including the representations of the counsel for Debtor and Lender, good and sufficient cause appearing therefore, IT IS HEREBY ORDERED (the "Interim Order") AND ADJUDGED THAT:

1.  The Motion is granted on an interim basis pending the Final Hearing (as defined below) and entry of the Final Order.  Debtor is hereby authorized to (i) enter into the Postpetition Loan Agreement and (ii) enter into all agreements, documents and instruments delivered pursuant hereto or thereto.  Debtor is hereby authorized to borrow money, and perform its obligations, under this Interim Order and the provisions of the Postpetition Loan Agreement, subject to and in compliance with the budget attached hereto as Schedule 1 (as may be supplemented from time to time, the "Budget").

2.  Debtor is authorized to use cash collateral during the period from the date of this Interim Order through the date of the Final Hearing, to the extent set forth in the Budget plus no more than five (5%) percent of the proposed expense payments.

3.  As security for the Loan and all Obligations (as defined in the Postpetition Loan Agreement) under the Loan, Lender is hereby granted valid, binding, enforceable and perfected liens (the "Postpetition Liens") in the Postpetition Collateral (as defined in the Postpetition Loan Agreement).  The Postpetition Liens shall have priority in accordance with the provisions of Bankruptcy Code section 364(c)(1) over all administrative expenses, as set forth therein, and shall also have priority over all administrative claims of the kind specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507 (a), 507(b), 546(c), or 726, subject only to the Carve Out (as defined in the Postpetition Loan Agreement) or as otherwise provided in this Interim Order.

4.   In return for Debtor's continued interim use of cash collateral and to the extent of any diminution in the value of Lender's prepetition security interests, Lender is granted a valid and perfected replacement lien (the "Replacement Liens") in all Postpetition Collateral and any proceeds thereof.  Notwithstanding the foregoing, the Replacement Liens shall only be effective to the extent of the validity, perfection, priority and enforceability of Lender's prepetition liens and security interests. The Replacement Liens shall also be subject to (i) the Carve Out (as defined in the Postpetition Loan Agreement), and (ii) such validly perfected liens and security interests on or in the Collateral as of the Petition Date that had priority over Lender's prepetition liens.

5.   The Postpetition Liens, the Replacement Liens, and all other liens and security interests granted herein shall, pursuant to this Interim Order, be and they hereby are, deemed perfected, and no further notice, filing or other act shall be required to effect such perfection; provided, however, if Lender shall, in its sole discretion, choose to file any financing statements and other similar documents, all such filings shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

6.   Based on the findings set forth in this Interim Order and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity and enforceability of any lien, security interest or priority authorized or created hereby, including the Postpetition Liens and the Replacement Liens.

7.   Debtor shall be permitted to pay compensation and reimbursement of expenses to professional persons employed under Bankruptcy Code sections 327 or 1103, as the same may be due and payable, to the extent such expenses are a part of the Carve-Out.  Lender shall advance funds to Debtor to satisfy the Carve-Out through and including the Due Date.  The Carve-Out shall be subject to any limitations provided in the Postpetition Loan Agreement.

8.   This Interim Order and the Post Petition Loan Agreement shall in no way waive or encumber the rights of the various trade unions and their respective Trust Funds (collectively referred to as the "Trade Unions") to assert claims and recover unpaid, pre-petition benefit contributions, wages, and dues in accordance with the Trade Unions' respective collective bargaining agreements, any of Debtor's subcontract Agreements, any General Contractors' Agreements with any prepetition project owners, applicable state and federal law, including constructive trust, mechanic's lien, and payment bond statutes, other constructive trust theories, and pursuant to any other equitable theories of recovery.  Prior to the Final Hearing (as defined below), Debtor shall hold and not disburse any proceeds of any Accounts (as defined in the Loan Agreement) it receives from any third party.

9.   Debtor shall, on or before April 21, 2011, serve by United States mail, first class postage prepaid, the proposed Final Order and a notice of the hearing (the "Final Hearing Notice") to be held on May 9, 2011 at 10:00 a.m. (the "Final Hearing") to consider entry of the proposed Final Order on:  (a) all of the Detor's known creditors; (b) the Office of the United States Trustee; (c) counsel to Lender; and (d) parties who have timely filed requests for notice under Bankruptcy Rule 2002.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the United States Bankruptcy Court Clerk for the Northern District of Illinois no later than 4 p.m. on Thursday, May 5, 2011, which objections shall be served so that the same are received on or before such date by:

(a) Scott Clar, Crane, Heyman, Simon, Welch & Clar, 135 S. LaSalle, Suite 3705, Chicago, Illinois 60603, Counsel to Debtor;

(b)  Jason J. DeJonker and Gus A. Paloian, Seyfarth Shaw LLP, 131 South
Dearborn Street, Suite 2400, Chicago, IL 60603-5577, Counsel to Lender; and

(c)  Office of the United States Trustee, 219 S Dearborn St # 873, Chicago,
IL 60604-2027.

10.  Prior notice of this Motion for purposes of this Interim Hearing
constitutes sufficient notice in accordance with the provisions of Bankruptcy Code
section 364 and Bankruptcy Rules 2002, 4001 and 9014, and any other applicable law,
and no other notice need be given for purposes of this Interim Order.

Enter:

Honorable A. Benjamin Goldgar
United States Bankruptcy Judge

Dated:  **2 0 APR 2011**

**Prepared by counsel of Movant:**

Jason J. DeJonker
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577
jdejonker@seyfarth.com
Phone (312) 460-5000
Fax (312) 460-7000

Counsel for FirstMerit Bank, N.A.

Rev: 20101008_bko

## POSTPETITION SENIOR SECURED LOAN AGREEMENT

**Dated as of April 20, 2011**

**among**

**CHAMPION ENVIRONMENTAL SERVICES, INC.**

**as Borrower**

**and**

**FIRSTMERIT BANK, N.A.**

**as Lender**

13289353v.6

This Postpetition Senior Secured Loan Agreement (the "Agreement") is made as of April __, 2011, among (1) Champion Environmental Services, Inc., a Wisconsin Corporation and debtor-in-possession under Chapter 11 (as defined herein) ("Borrower" or "Debtor"), and (2) FirstMerit Bank, N.A. ("Lender").

## RECITALS:

A.      Prior to the Petition Date, Lender made loans, advances and extensions of credit available to Debtor pursuant to the terms of, *inter alia*, (1) a Business Loan Agreement dated September 30, 2008, as amended; (2) a Promissory Note dated September 30, 2008 in the principal amount of $4,000,000.00, as amended; (3) a Promissory Note dated November 21, 2008 in the principal amount of $100,000.00; (4) a Third Amended and Restated Term Note dated February 1, 2010 in the principal amount of $864,592.52 (the original Term Note was dated January 29, 2009 in the principal amount of $1,000,000.00); (5) a Third Amended and Restated Term Note dated February 1, 2010 in the principal amount of $275,000 (the original Term Note was dated May 19, 2009 in the principal amount of $325,000.00); (5) a Fixed Rate Note having an effective date of February 1, 2010 in the principal amount of $400,000.00; (6) a Commercial Security Agreement dated September 15, 2008; (7) a Cross-Collateralization and Cross-Default Agreement dated January 29, 2009; (8) a Cross-Collateralization and Cross-Default Agreement dated July 1, 2009; (9) a Stand-Still Agreement dated January 29, 2009, (10) First Amended and Restated Stand-Still Agreement dated July 1, 2009; (11) Second Amended and Restated Stand-Still Agreement dated November 1, 2009; (12) Third Amended and Restated Stand-Still Agreement dated February 1, 2010; and (13) any and all other instruments, certificates, agreements and documents executed by or on behalf of Debtor at any time in connection with any of the foregoing (all the foregoing instruments, certificates, agreements and documents, as extended, amended, restated, supplemented or otherwise modified from time to time shall collectively be referred to herein as the "Prepetition Loan Documents")

B.      Lender asserts that repayment of the loans and extensions of credit under the Prepetition Loan Documents are secured by, *inter alia*, valid, properly perfected, first-priority security interests and Liens (as defined below) (collectively, the "Prepetition Liens") in and to, *inter alia*, all of Debtor's personal property as of the Petition Date (collectively, the "Prepetition Collateral") including, *inter alia*, all Accounts, Chattel Papers, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Proceeds, Records, Software and Supporting Obligations (each capitalized term as defined below). As of the Petition Date, Lender asserts that Debtor owed approximately $5,312,975.79 in principal to Lender under the Prepetition Loan Documents.

C.      On April 11, 2011 (the "Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. Borrower's case is currently pending before the Bankruptcy Court under Case No. 11-15354 (the "Bankruptcy Case").

D.      An immediate and ongoing need exists for Borrower to obtain funds in order to allow Debtor to pay payroll, to purchase inventory, to meet ordinary and necessary expenses of

- 1 -

operation, and to preserve the value of Debtor and its assets. Accordingly, Borrower has requested that Lender extend postpetition financing.

E.      Lender is willing to provide postpetition financing and incur additional obligations pursuant to Bankruptcy Code sections 363, 364(c), and 364(d)(1), but only for the purposes and upon the terms and conditions set forth in this Agreement.

F.      It is contemplated by the parties hereto that the Bankruptcy Court will enter a Final DIP Order (as defined herein) that will approve this Agreement and will authorize Borrower, pursuant to Bankruptcy Code sections 363, 364(c), and 364(d)(1), to incur postpetition date senior secured indebtedness under the terms and conditions set forth in this Agreement (the "DIP Facility").

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties agree as follows:

## 1.  DEFINITIONS.

Capitalized terms used in this Agreement shall have the following respective meanings when used herein:

1.1     "Affiliate" shall mean with respect to any Person (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, five percent or more of the stock or partnership interest having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person or any Affiliate of such Person or (c) each of such Person's officers, directors, joint ventures and partners.  For the purpose of this definition, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of such Person's management or policies, whether through the ownership of voting securities, by contract or otherwise.

1.2     "Agreement" shall mean this Postpetition Senior Secured Loan Agreement including the schedules and exhibits attached hereto.

1.3     "Bankruptcy Case" shall have the meaning set forth in the Recitals.

1.4     "Bankruptcy Code" shall mean Title 11 of the United States Code, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

1.5     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, or any other court having competent jurisdiction over the Bankruptcy Case.

1.6     "Borrower" or "Debtor" shall mean Champion Environmental Services, Inc., a Wisconsin Corporation and debtor-in-possession under Chapter 11 in the Bankruptcy Case.

- 2 -

1.7    "Budget" shall mean the budget attached hereto as Schedule 1 setting forth the expenses and other items that are to be satisfied by the Loans.

1.8    "Budget Month" shall mean a month that is the subject of the Budget.

1.9    "Business Day" shall mean any day on which banks are open for business in the State of Illinois.

1.10    "Carve-Out" shall have the meaning set forth in Section 5.7(g).

1.11    "Claim" shall have the meaning set forth in Bankruptcy Code section 101(5).

1.12    "Closing Date" shall mean the date on which the Bankruptcy Court enters the Interim DIP Order.

1.13    "Crane Heyman" shall have the meaning set forth in Section 5.7(g) hereof.

1.14    "Default" shall mean any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

1.15    "Default Interest Rate" shall mean the Prime Rate plus five (5%) percentage points.  Notwithstanding anything to the contrary contained herein, for purposes of calculating the rate of interest in this Agreement and any Note, in no event shall the Default Rate be below ten percent (10.0%).

1.16    "Default Hearing" shall have the meaning set forth in Section 10.5 hereof.

1.17    "DIP Commitment" shall mean an amount not to exceed Four Hundred Thousand Dollars ($400,000.00), or such other amount as may be agreed to in writing by the Parties.

1.18    "DIP Facility" shall have the meaning set forth in the Recitals.

1.19    "Due Date" shall have the meaning set forth in Section 2.3 hereof.

1.20    "Event of Default" shall have the meaning set forth in Section 10.1 hereof.

1.21    "Final DIP Order" shall mean a Final Order entered by the Bankruptcy Court pursuant to Bankruptcy Code section 364(d), in a form and substance acceptable to Lender and as entered by the Bankruptcy Court, approving this Agreement and authorizing the incurrence by Borrower of postpetition senior secured indebtedness in accordance with the terms and conditions of this Agreement.

1.22    "Final DIP Hearing" shall mean the hearing set by the Bankruptcy Court for hearing on the Final DIP Order.

1.23    "Final Order" shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereof) the time to

- 3 -

appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

1.24    "GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

1.25    "Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including, *inter alia*, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured, but not including obligations to trade creditors incurred in the ordinary course of business), (b) all obligations evidenced by a promissory note, debentures, bonds, or similar instruments, (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (d) all indebtedness referred to in clauses (a) through (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, *inter alia*, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (e) the Obligations and (f) any guaranty of such Person relating to any Indebtedness set forth in clause (a)-(e) above.

1.26    "Intellectual Property" shall have the meaning set forth in Section 4.4 hereof.

1.27    "Interest Rate" shall mean the Prime Rate plus one-half (0.5%) of a percentage point. Notwithstanding anything to the contrary contained herein, for purposes of calculating the rate of interest in this Agreement and any Note, in no event shall the Interest Rate be below six percent (6.0%).

1.28    "Interim DIP Order" shall mean a Final Order approving interim financing entered by the Bankruptcy Court under Bankruptcy Code section 364(c) and (d) (in form and substance agreeable to Lender)

1.29    "IRS" shall mean the Internal Revenue Service, or any successor thereto.

1.30    "Lender" shall mean FirstMerit Bank, N.A.,, as lender hereunder, or any successor thereto.

1.31    "Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, *inter alia*, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the law of any jurisdiction).

- 4 -

1.32    "Loan" shall mean an advance made by Lender to Borrower pursuant to this Agreement, and "Loans" shall mean all such advances.

1.33    "Note" shall have the meaning set forth in Section 2.2(b) hereof.

1.34    "Notice of Contest" shall have the meaning set forth in Section 11.18.

1.35    "Notice of Contest Deadline" shall have the meaning set forth in Section 11.18.

1.36    "Obligations" means the Loans, the accrued interest thereon, and all other Indebtedness, advances, debts, fees, expenses, liabilities, obligations, covenants and duties owing by Borrower to Lender of every type and description, present or future, whether or not evidenced by any note, guaranty or other instrument, directly arising under or relating to this Agreement or under any other Postpetition Loan Document, whether or not for the payment of money, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including, *inter alia*, those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

1.37    "Orders" shall mean the Interim DIP Order and the Final DIP Order.

1.38    "Other Taxes" shall have the meaning set forth in Section 2.8(b) hereof.

1.39    "Parties" shall mean, collectively, Lender and Borrower.

1.40    "Patents" shall have the meaning set forth in Section 4.4 hereof.

1.41    "Permitted Variance" shall mean expenses and disbursements that do not exceed the amounts set forth in Budget for the relevant Budget Month by more than five percent (5%) in the aggregate.

1.42    "Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government (whether Federal, state, county, city, municipal or otherwise, including, *inter alia*, any instrumentality, division, agency, body or department thereof).

1.43    "Petition Date" shall have the meaning set forth in the Recitals.

1.44    "Postpetition Collateral" shall have the meaning set forth in Section 4.1 hereof.

1.45    "Postpetition Loan Documents" shall mean this Agreement, the Note, and all other instruments and agreements executed in connection with this Agreement.  Any reference in this Agreement or any other Postpetition Loan Document to a Postpetition Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Postpetition Loan Document as the same may be in effect at any and all times such reference becomes operative.

1.46    "Prepetition Collateral" shall have the meaning set forth in the Recitals.

- 5 -

1.47   "Prepetition Liens" shall have the meaning set forth in the Recitals.

1.48   "Prepetition Loan Documents" shall have the meaning set forth in the Recitals.

1.49   "Prepetition Indebtedness" means any loans, the accrued interest thereon, and all other Indebtedness, advances, debts, fees, expenses, liabilities, obligations, covenants and duties owing by Borrower to Lender of every type and description, present or future, whether or not evidenced by any note, guaranty or other instrument, directly arising under or relating to or under any of the Prepetition Loan Documents, whether or not for the payment of money, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including, *inter alia*, those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

1.50   "Prime Rate" shall mean the floating per annum rate of interest which at any time, and from time to time, shall be most recently announced by Lender as its Prime Rate, which is not intended to be Lender's lowest or most favorable rate of interest at any one time. The effective date of any change in the Prime Rate shall for purposes hereof be the date the Prime Rate is changed by Lender. Lender shall not be obligated to give notice of any change in the Prime Rate.

1.51   "Professionals" shall have the meaning set forth in Section 5.7(g) hereof.

1.52   "Sale Proceeds" shall have the meaning set forth in Section 2.4 hereof.

1.53   "Taxes" shall mean any and all present or future taxes, levies, imposts, deductions, charges, or withholdings attributable thereto and all liabilities with respect thereto.

1.54   "Titled Vehicles" shall mean each of (a) a 2002 Cadillac Escalade XT, (b) a 2003 Cadillac Escalade XT, and (c) a 2005 Cadillac Escalade XT titled in the name of Champion Environmental Services, Inc.

1.55   "Trademarks" shall have the meaning set forth in Section 4.4 hereof.

1.56   "UCC" shall mean the Uniform Commercial Code of the State of Illinois (810 ILCS 5/1-101, *et seq.*), as the same may be amended, modified or supplemented from time to time.

1.57   "United States Trustee" shall mean the United States Trustee appointed to serve in the Northern District of Illinois pursuant to 28 U.S.C. § 581 *et seq.*

1.58   Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP consistently applied. That certain terms or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing. All other undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the Bankruptcy Code to the extent the same are used or defined therein. The words "herein," "hereof" and

- 6 -

"hereunder" and other words of similar import refer to this Agreement as a whole, including any schedules and exhibits attached hereto, as the same may from time to time be amended, modified or supplemented and not to any particular Bankruptcy Code section, subsection or clause contained in this Agreement.

1.59    Each reference to a Bankruptcy Code section or exhibit are to a Bankruptcy Code section or exhibit of or to this Agreement, unless otherwise specified or the context otherwise requires.

1.60    Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

## 2.  AMOUNT AND TERMS OF LOAN.

2.1    Commitment to Provide Loans.  Lender agrees, on the terms and conditions set forth in this Agreement, to make Loans to the Debtor from time to time prior to the Due Date in an aggregate principal amount not exceed to the Loan Amount, provided that (a) no Event of Default has occurred or is continuing and (b) the Loans advanced are used solely for the expenses and items set forth in the Budget attached hereto as Schedule 1.

2.2    Method of Borrowing.

(a)    The Debtor shall request Loans by submitting a written request to Lender by no later than 11 a.m. prevailing Central Time on the second Business Day of any Budget Month specifying the principal amount of the Loan requested for the next succeeding Budget Month. Lender shall honor each loan request by making, on the first Business Day of the Budget Month to which such request relates, a wire transfer to Borrower's operating account in the amount of the Loan requested, provided that (i) honoring the request would not cause the aggregate amount of outstanding Loans to exceed the Loan Amount, (ii) no Event of Default has not occurred and is continuing, and (iii) the Loans advanced are used solely for the expenses and items set forth in the Budget. Each request for an advance shall constitute a representation by the Debtor that each of the conditions to Loans in Article 3 has been satisfied and that each of the representations and warranties in Article 5 of this Agreement is true and complete in all material respects as of the date of such request.

(b)    Each advance made by Lender shall constitute a Loan, and shall be evidenced by the promissory note made payable to Lender, substantially in the form attached hereto as Exhibit A (the "Note"). The entire unpaid balance of the Loans and all accrued and unpaid interest thereon and any other Obligations shall be due and payable on the Due Date.

2.3    Due Date. The Loans shall mature, and the principal amount of all outstanding Loans, together with all accrued and unpaid interest thereon and all other Obligations that may be due to Lender under this Agreement, shall be immediately due and payable from the assets of Borrower or the proceeds of the disposition thereof by Borrower to Lender upon (the "Due Date"):

13289353v.6

(a)    The earliest of the following: (i) the date that is three (3) months after the Petition Date; (ii) thirty (30) days after the entry of the Interim DIP Order, or any subsequent interim order, if the Final DIP Order has not been entered prior to the expiration of such period; (iii) the date on which the Court enters a Final Order approving a postpetition financing between Debtor and another party; and (iv) the acceleration of the Loan and the termination of the DIP Facility in accordance with the Postpetition Loan Agreement; or

(b)    Such other date as agreed to in writing by Lender and Borrower or its successor in interest.

Notwithstanding the occurrence of the Due Date or any other provision of this Agreement, Lender shall advance funds to Borrower to satisfy the Carve-Out through and including such Due Date, pursuant to and in accordance with the Budget, when such fees are allowed by a Final Order of the Bankruptcy Court, regardless of (1) the timing of the entry of such Final Order or (2) the status of the Loan at that time.

2.4    Repayment and Prepayment.

(a)    The entire unpaid principal amount of the Loan, together with all accrued and unpaid interest thereon and all other Obligations that may be due to Lender under this Agreement, shall be due and payable on the Due Date.

(b)    Borrower may prepay the Loan or any portion thereof at any time which prepayment shall be applied, first, to accrued and unpaid interest on such Loan and capitalized interest, fees and expenses, if any, on the Obligations and, second, to principal in respect of the Loan.

(c)    Upon (1) the sale of any Postpetition Collateral of Debtor (other than inventory in the ordinary course of business) or (2) receipt of any insurance proceeds upon any casualty event related to or insuring any Postpetition Collateral, Debtor shall seek authority from the Bankruptcy Court to repay the Obligations from any net cash proceeds received by Debtor (the "Sale Proceeds"). Provided Debtor receives authority from the Bankruptcy Court, Debtor shall apply any Sale Proceeds first, to accrued unpaid interest under the Loans, and second, to repay outstanding principal under the Loans. Debtor shall hold any excess proceeds pending further order of the Bankruptcy Court or any such other court that has jurisdiction over Debtor. Each such mandatory prepayment shall result in a permanent reduction of the DIP Commitment; provided, that the DIP Commitment shall not be reduced below the minimum amount needed to meet all the obligations of Debtor, all as set forth in and in accordance with the Budget.

2.5    Use of Proceeds.  The proceeds of the Loans shall be used only to pay the expenses and items set forth in the Budget, in accordance with the Budget, subject to the Permitted Variance.

2.6    Interest on Loan.  Interest on the Loans shall accrue at a rate per annum equal to the Interest Rate, provided, however, that upon the occurrence and continuation of an Event of Default, interest on the Loans shall accrue at a rate per annum equal to the Default Interest Rate.

- 8 -

2.7    Access. Lender and its respective agents or representatives shall have the right during normal business hours (or at such other times as may reasonably be requested by Lender) to inspect, audit and make extracts from all of Borrower's records, files and books of account. Borrower shall instruct its banking and other financial institutions, accountants and other advisors and agents to make available to Lender such information and records as Lender may reasonably request.

2.8    [Intentionally Omitted]

2.9    Loan Account and Accounting. Lender shall maintain a loan account (the "Loan Account") on its books to record the advance of the Loan proceeds, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Loan or any other Obligations. The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive rebuttable evidence of the amounts due and owing to Lender by Borrower; *provided* that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower' duty to pay the Obligations. Lender shall render to Borrower a monthly accounting of transactions with respect to the Loan setting forth the balance of the Loan Account as to Borrower for the immediately preceding month. Notwithstanding any provision herein contained to the contrary, Lender may rely on the Loan Account as evidence of the amount of Obligations from time to time owing to it.

2.10    Single Loan. The Loan to Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Postpetition Loan Documents shall constitute one general obligation of Borrower secured, until the Termination Date, by all of the Postpetition Collateral.

3.    **CONDITIONS PRECEDENT FOR FUNDING OF LOANS.**

Lender's obligation to make a Loan to Borrower is subject to the satisfaction of each of the following conditions precedent on any relevant borrowing date:

3.1    Lender shall have received a fully executed copy of this Agreement, the Note and any other Postpetition Loan Documents;

3.2    The Bankruptcy Court shall have entered the Interim DIP Order and shall not have been vacated, revised, modified or amended;

3.3    The Bankruptcy Court shall have entered the Final DIP Order within thirty (30) days of the Closing Date and shall not have been vacated, revised, modified or amended;

3.4    Within five (5) days of the date of entry of the Interim DIP Order, Borrower shall have delivered to Lender all motor vehicles with respect to the Titled Vehicles and shall have assisted Lender, as necessary, in perfection of Lender's security interest in the Titled Vehicles;

3.5    Borrower shall have taken such action as Lender shall have requested in order to perfect the Liens in favor of the Lender created pursuant to this Agreement, the Postpetition

- 9 -

Loan Documents and the Orders; and Borrower shall have properly prepared and executed (if necessary) for filing any documents (including, without limitation, financing statements) requested by Lender be filed, registered or recorded in order to further evidence the perfected, first priority security interest in the Postpetition Collateral created under this Agreement and the Orders, subject to no Liens other than those created in favor of Lender hereunder and under the Orders and other Liens permitted hereunder;

3.6    All of Borrower's representations and warranties contained in this Agreement and the other Postpetition Loan Document, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each Loan with the same effect as if made on and as of such date; and

3.7    No default or Event of Default shall have occurred and be continuing.

## 4.  SECURITY.

4.1    Borrower's Obligations shall be secured by a valid, perfected and first-priority Lien on all assets and properties of Borrower now owned or hereafter acquired, including all replacements, additions, accessions, substitutions, and products thereto (the "Postpetition Collateral").

4.2    The Postpetition Collateral shall include, *inter alia*, the following (all capitalized terms not previously defined shall have the meanings ascribed to them in Section 4.4 below):

(a)    all Accounts, which shall include, *inter alia*, all of Borrower's now-owned and hereafter acquired or arising accounts, accounts receivable and rights to payment of every kind and description, and all of Borrower's contract rights, chattel paper, documents and instruments with respect thereto, together with all fees and other payments due Borrower in connection and all of Borrower's rights, remedies, security and Liens, in, to and in respect of such accounts, including, *inter alia*, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party;

(b)    all Goods whose sale, lease or other disposition by such Borrower has given rise to Accounts and that have been returned to, or repossessed or stopped in transit by, such Borrower;

(c)    all now owned and hereafter acquired or arising Chattel Paper, Instruments, Documents, Supporting Obligations and General Intangibles (including all Intellectual Property and all payment intangibles), which shall include, *inter alia*, any other property of every kind and description with respect to, evidencing, or relating to their accounts, accounts receivable, and other rights to payment, including, but not limited to, all existing and future customer lists, chose in action, claims, books, records, ledger cards, contracts, licenses, formulae, tax and other types of refunds, deposits, returned and unearned insurance premiums, rights and claims under insurance policies, and computer programs, information, software, records, and data as the same relates to the accounts;

- 10 -

(d)    all Inventory, including, *inter alia*, any now owned and hereafter acquired inventory of every kind and character which is held by Borrower for sale or lease, or is furnished by Borrower under any contract of service, or is held by Borrower as raw materials, work in process, or materials used or consumed in business, wherever located and as the same may now or hereafter be constituted, together with all cash and non-cash proceeds and products thereof;

(e)    all Goods (other than Inventory, including, *inter alia*, Equipment (and all Documents issued with respect thereto), vehicles and Fixtures, including, *inter alia*, all now owned or hereafter acquired real property, machinery, equipment, tools, tooling, furniture, fixtures, goods, supplies, materials, vehicles (including, *inter alia*, the Titled Vehicles), work in process, together with additions, parts, fittings, accessories, special tools, attachments, and accessions, and all replacements and substitutions thereof;

(f)    all Deposit Accounts, bank accounts, deposit and cash, which shall include, *inter alia*, all moneys, securities, cash, cash equivalents, and other property and the proceeds thereof, now or hereafter held or received by, in transit to, in possession of, or under the control of Lender or a bailee or an Affiliate of Lender, from or for Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of Borrower's deposits (general or special), balances, sums and credits with Lender at any time existing;

(g)    all Investment Property;

(h)    all Letter-of-Credit Rights;

(i)    Commercial Tort Claims and all of the Borrower' avoidance power actions and under chapter 5 of the Bankruptcy Code;

(j)    any other property of Borrower now or hereafter in the possession, custody or control of the Lender or any agent or any parent, affiliate or subsidiary of the Lender for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); and

(k)    all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property and any income, profits, and proceeds of all of the foregoing, including, *inter alia*, Proceeds of all insurance policies insuring the foregoing property, stock rights, subscription rights, dividends, stock dividends, stock splits, or liquidating dividends, and all cash, Accounts, Chattel Paper, Instruments, Investment Property, and General Intangibles arising from the sale, rent, lease, casualty loss or other disposition of the Postpetition Collateral and any Postpetition Collateral returned to, repossessed by or stopped in transit by Borrower, and all insurance claims or proceeds of litigation relating to any of the Postpetition Collateral, and all of such Borrower's books, Records and data, including all Software relating to any of the foregoing and to such Borrower's business.

4.3    Notwithstanding the forgoing, with respect to any items which are leased and not owned by Borrower, the term "Postpetition Collateral" includes the leasehold interest only of Borrower together with any options to purchase any of said items and any additional or greater rights with respect to such items which Borrower may hereafter acquire.

- 11 -

4.4     For purposes of this Agreement, the following terms shall have the following meanings:

(a)     "Account," "Chattel Paper," "Commercial Tort Claims," "Deposit Accounts," "Documents," "Equipment," "Fixtures," "General Intangibles," "Goods," "Instruments," "Inventory," "Investment Property," "Letter-of-Credit Rights," "Proceeds," "Records," "Software" and "Supporting Obligations" shall have the respective meanings assigned to such terms in the UCC.

(b)     "Intellectual Property" shall mean all United States and foreign Patents (as defined below), Trademarks (as defined below), trade secrets, and know-how, now owned or hereafter acquired by Borrower, and all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

(c)     "Patents" shall mean all of the following now owned or hereafter acquired by Borrower: (i) all United States, international and foreign patents, all registrations and recordings thereof, and all rights therein provided by international treaties or conventions, and all United States, international and foreign patent applications, including registrations, recordings and pending applications in the United States Patent and Trademark Office, and (ii) all reissues, continuations, divisions, continuations-in-part, provisionals, substitutes, renewals or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use, sell, offer for sale and/or import the inventions disclosed or claimed therein.  Patents shall include, without limitation, (x) all inventions and improvements described or claimed therein, (y) the right to sue or otherwise recover for any infringements or misappropriations thereof, and (z) all income, royalties, damages and other payments now and hereinafter due and/or payable with respect thereto (including, without limitation, payments under all patent licenses entered into in connection therewith, and damages and payments for past and future infringements thereof).

(d)     "Trademarks" shall mean all of the following now owned by Borrower: (i) all United States and foreign trademarks, service marks, trade names, domain names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office, or any State of the United States, and all extensions or renewals thereof (other than intent-to-use trademark or service mark applications), (ii) all goodwill associated therewith or symbolized thereby and (iii) all other assets, rights and interests that uniquely reflect or embody such goodwill.  Trademarks shall include, without limitation, (x) the right to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof, and (y) all income, royalties, damages and other payments now and hereafter due and/or payable with respect thereto (including, without limitation, payments under all trademark licenses entered into in connection therewith, and damages and payments for past or future infringements thereof).

- 12 -

4.5     Lender will be entitled to the protections and priorities provided under Section 507(b).  No other claim having a priority superior to that granted to Lender by the Final DIP Order shall be granted while any portion of the Obligations remain outstanding.

4.6     Upon entry of the Final DIP Order, the Liens and security interests granted to Lender on the Postpetition Collateral by virtue of the Final DIP Order and this Agreement shall be first, valid and perfected without regard to applicable federal, state or local filing or recording statutes; provided, however, that Lender may, but need not, take such steps as it deems desirable and applicable to comply with such statutes.  Pursuant to and as provided in the Orders, as security for the full and timely repayment and performance of all of the Obligations, Borrower hereby as of the date hereof pledges and grants to Lender pursuant to Bankruptcy Code section 364 a perfected security interest in and to and Lien on all of its right, title and interest in, to and under all the Postpetition Collateral whether now owned or hereafter acquired, now existing or hereafter created and wherever located.  Borrower agrees to use commercially reasonable efforts to mark its books and records (including, but not limited to, its computer records) to evidence the security interests granted to Lender hereunder.

4.7     Borrower shall, at its expense, promptly and duly execute and deliver, and cause to be recorded, such agreements, instruments and documents and perform any and all actions reasonably requested by Lender at any time and from time to time to perfect, maintain, protect, and enforce Lender's security interest in the Postpetition Collateral of such Borrower.  Borrower hereby authorizes Lender at any time and from time to time to execute and file financing statements or continuation statements and amendments thereto and other filing or recording documents or instruments with respect to the Postpetition Collateral without the signature of such Borrower in such form and in such offices as Lender determines appropriate to perfect the security interests of Lender under this Agreement.  Borrower shall pay the costs of, or incidental to, any recording or filing of any financing statements concerning the Postpetition Collateral.  Borrower agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.  From time to time, Borrower shall, upon Lender's request, execute and deliver written instruments pledging to Lender the Postpetition Collateral described in any such instruments or otherwise, but the failure of Borrower to execute and deliver such confirmatory instruments shall not affect or limit Lender's security interest or other rights in and to the Postpetition Collateral.  Until the Due Date, Lender's security interest in the Postpetition Collateral, and all proceeds and products thereof, shall continue in full force and effect.

4.8     Notwithstanding this Section 4, or any failure on the part of Borrower or Lender to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim DIP Order and the Final DIP Order, as applicable.  No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement or the Orders.

4.9     Lender shall not have any obligation or liability with respect to any contractual obligation of Borrower by reason of or arising out of this Agreement, the other Postpetition Loan Documents or the Orders, or the granting to Lender of a security interest and Lien therein or the

- 13 -

receipt by Lender or any Lender of any payment relating to any contractual obligation of such Borrower, nor shall Lender be required to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by such Borrower under any of its contractual obligations (or of any other party to any agreement to which such Borrower is a party), or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

4.10    Lender authorizes Borrower to collect its accounts receivable, provided that such collection is performed in accordance with such Borrower's customary procedures, and Lender may, upon the occurrence and during the continuation of any Event of Default and immediately upon notice, other than any requirement of notice provided in the Orders, limit or terminate said authority at any time.

4.11    Upon written request from Lender after the occurrence and during the continuation of an Event of Default, Borrower shall provide and deliver to Lender (or its representative) a full and complete copy of all of Borrower's books and records pertaining to the Postpetition Collateral.

## 5.    **REPRESENTATIONS AND WARRANTIES.**

Borrower hereby covenants, represents and warrants to Lender that:

5.1    <u>Organization; Powers</u>.  Borrower (a) is a corporation duly incorporated, formed or organized, as the case may be, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization, as the case may be, (b) has all requisite corporate, partnership or similar power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, and (c) has the corporate power and authority to execute, deliver and perform its obligations under this Agreement and each of the Postpetition Loan Documents.

5.2    <u>Authorization</u>.  The execution, delivery and performance by Borrower under this Agreement and each of the Postpetition Loan Documents (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not violate (i) any provision of law, statute, rule or regulation applicable to Borrower, (ii) the certificate or articles of incorporation or other constitutive documents or by-laws of Borrower, (iii) any order of any governmental authority applicable to Borrower (subject to the entry of the Interim DIP Order and Final DIP Order), or (iv) any provision of any indenture, agreement or other instrument to which Borrower is a party or by which any of them or any of their property is or may be bound.

5.3    <u>Enforceability</u>.  This Agreement and each of the Postpetition Loan Documents has been duly executed and delivered by Borrower and constitutes a legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms, subject to the Bankruptcy Code.

5.4    [Intentionally Omitted]

- 14 -

13289353v.6

5.5     No Material Adverse Change. There has been no material adverse change in the assets, prospects, financial condition, or otherwise, taken as a whole, since the Petition Date.

5.6     Use of Proceeds. Borrower shall use the proceeds of the Loans only to pay the expenses and items set forth in the Budget, in accordance with the Budget.

5.7     Bankruptcy / Debtor-in-Possession Financing. Upon the entry of Orders, as applicable, on and after the date hereof:

(a)     the priority of Lender's Liens on the Postpetition Collateral shall be set forth in the Orders;

(b)     all Obligations shall constitute administrative expenses of Borrower in the Bankruptcy Case, with administrative priority and senior secured status under Bankruptcy Code section 364(c). Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses in the Bankruptcy Case of the kinds specified in, or ordered pursuant to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Interim DIP Order), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise as set forth in any Order, and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee(s) or estate representative(s) in the Bankruptcy Case or any subsequent proceeding or case relating to Borrower under the Bankruptcy Code;

(c)     the Liens granted to Lender on the Postpetition Collateral owned by Borrower, and the priorities accorded to the Obligations, shall have first priority perfected and senior secured status afforded by Bankruptcy Code section 364(c) (all as more fully set forth in the Orders) senior to all claims and interests other than the Carve-Out;

(d)     the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Bankruptcy Code section 364(c) (all as more fully set forth in the Orders) senior to all claims and interests other than the Carve-Out;

(e)     the Liens, lien priority, administrative priorities and other rights and remedies granted to Lender pursuant to this Agreement or the Orders (specifically including, *inter alia*, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrower (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Bankruptcy Case, or by any other act or omission whatsoever;

(f)     notwithstanding any failure on the part of any Borrower, on the one hand, or Lender on the other hand, to perfect, maintain, protect or enforce the Liens on the Postpetition Collateral granted hereunder, the Interim DIP Order and the Final DIP Order (when entered) shall automatically, and without further action by any Person, perfect such Liens against the Postpetition Collateral;

- 15 -

13289353v.6

(g)     Lender's Liens on the Postpetition Collateral and Lender's administrative claims under Bankruptcy Code section 364(c)(1) afforded the Obligations shall also have priority over any claims arising under Bankruptcy Code section 506(c), provided that Lender's Lien on the Postpetition Collateral shall be subject and subordinate to the following (the "Carve-Out"): (i) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 (including, without limitation, fees under 28 U.S.C. § 1930(a)(6)), (ii) the fees due to the Clerk of the Court, and (iii) the actual fees and expenses incurred by counsel for Borrower, Crane, Heyman, Simon, Welch & Clar ("Crane Heyman"), in an amount not to exceed $25,000 (following application of any retainer received by Crane Heyman), and (iv) the actual fees and expenses incurred by other professionals for Borrower retained by an order of the Bankruptcy Court entered pursuant to Bankruptcy Code sections 327, 328 or 1103 (collectively, with Crane Heyman, the "Professionals"), subject to a cap in an amount to be negotiated between Borrower and Lender. With respect to each of (iii) and (iv) in the preceding sentence, the Carve-Out (x) shall only include those amounts set forth in the Budget that are subsequently allowed by the Bankruptcy Court under Bankruptcy Code sections 330 and 331 and (y) Lender shall have no obligation to loan funds to or otherwise pay any fees and expenses of Professionals incurred after the Due Date;

(h)     Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Bankruptcy Case under any chapter of the Bankruptcy Code, and nothing herein shall be construed to obligate Lender in any way to pay compensation to or to reimburse expenses of any Professional, or to guarantee that Borrower have sufficient funds to pay such compensation or reimbursement; and

(i)     upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Postpetition Loan Documents, Lender shall be entitled to immediate payment of such Obligations.

## 6.     **REPORTING REQUIREMENTS.**

Borrower covenants and agrees that from and after the Closing Date and until the Due Date, it shall deliver the following to Lender:

6.1     As soon as practicable, but in any event within five (5) Business Days after Borrower becomes aware of the existence of any Default or Event of Default, telephonic or facsimile notice specifying the nature of such Default or Event of Default or development or information, including the anticipated effect thereof;

6.2     Copies of all federal, state, and local tax returns and reports filed by Borrower;

6.3     Copies of all notices given, motions and documents filed, and orders entered in the Bankruptcy Case;

6.4     After the date of any payment of Taxes by Borrower, the original or a certified copy of a receipt evidencing payment of such Taxes;

- 16 -

6.5     Such other information regarding Borrower's businesses, financial condition, or prospects as Lender may, from time to time, reasonably request.

## 7.  AFFIRMATIVE COVENANTS.

The following covenants shall be binding on Borrower from and after the date hereof and until the repayment in full of the Obligations:

7.1     Maintenance of Existence and Conduct of Business.  Borrower covenants and agrees to (a) do all things necessary to preserve and keep in full force and effect its corporate existence, as applicable, and (b) continue to conduct its business substantially as now conducted, as provided for in this Agreement and the Term Sheet or as otherwise agreed to in writing by Lender.

7.2     Collateral.  With respect to the Postpetition Collateral, Borrower will:

(a)     keep and maintain, at its own cost and expense, records of the Postpetition Collateral, in all material respects.

(b)     advise Lender promptly, in reasonable detail, (A) of any Lien asserted against any of the Postpetition Collateral and (B) of the occurrence of any other event which would be reasonably expected to result in a Material Adverse Effect with respect to the aggregate value of the Postpetition Collateral or on the security interests created hereunder; and

(c)     keep and maintain all equipment in good operating condition sufficient for the continuation of the business conducted by the Borrower on a basis consistent with past practices, ordinary wear and tear excepted.

7.3     Books and Records.  Borrower covenants and agrees to keep adequate records and books of account with respect to its business activities, in which proper entries, reflecting all of their financial transactions, are made in accordance with GAAP.

7.4     Compliance with Law.  Borrower covenants and agrees to comply with all federal, state and local laws and regulations applicable to it, including environmental laws, except where such noncompliance is not reasonably expected to have a material adverse effect on Borrower, its businesses or its financial positions.

7.5     Supplemental Disclosure.  From time to time as may be necessary (in the event that such information is not otherwise delivered by Borrower to Lender pursuant to this Agreement), so long as there are Obligations outstanding, Borrower covenants and agrees to supplement or amend each representation herein with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in an exception to such representation or which is necessary to correct any information in such representation which has been rendered inaccurate thereby.

7.6     Waiver of Any Priming Rights.  From and after the date hereof, and for itself and on behalf of its bankruptcy estate, and for so long as any Obligations shall be outstanding, and subject to any written agreement between Borrower, Lender, and any third parties approved by

13289353v.6

the Bankruptcy Court, Borrower hereby irrevocably waives any right (a) to obtain postpetition loans or other financial accommodations, pursuant to Bankruptcy Code sections 364(c) or 364(d) or otherwise, (b) to grant any Lien of equal or greater priority than the Liens granted to Lender securing the Obligations, or (c) to approve a claim of equal or greater priority than the Obligations, as a result of which the Postpetition Collateral would become encumbered by any Lien or claim that primes or is *pari passu* with the protections afforded to Lender in the Orders.

7.7    Further Assurances. Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable law, or which Lender may reasonably request, to effectuate the transactions contemplated by the Postpetition Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Postpetition Loan Documents or the validity or priority of any such Lien, all at the expense of Borrower. Borrower also agrees to provide to Lender, from time to time upon request, evidence reasonably satisfactory to Lender as to the perfection and priority of the Liens created or intended to be created by the Postpetition Loan Documents, including, without limitation, periodic lien searches as deemed necessary by Lender in its reasonable discretion.

7.8    Taxes. Borrower agrees to pay any present or future Taxes that arise from any payment made hereunder or under any note or from the execution or delivery of, or otherwise with respect to, this Agreement or the Note. If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to Lender, Borrower shall (i) make such deductions and (ii) pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law.

## 8. NEGATIVE COVENANTS.

The following covenants shall be binding on Borrower from and after the date hereof and until the repayment in full of the Obligations:

8.1    Mergers, and Other Material Transactions. Borrower shall not directly or indirectly, by operation of law or otherwise, merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with, any Person, unless otherwise agreed to in writing by Lender. Borrower shall not enter into or permit to exist any transaction or series of transactions with any officer, director or Affiliate of such Person except with the written consent of Lender.

8.2    Maintenance of Business. Borrower shall not engage in any business other than the businesses currently engaged in by Borrower unless otherwise agreed to in writing by Lender.

8.3    Maintenance of Collateral. Borrower shall not create, permit or suffer to exist, and will defend the Postpetition Collateral against and take such other action as is necessary to remove, any Lien on the Postpetition Collateral and will defend the right, title and interest of Lender in and to all of Borrower's rights under the Postpetition Collateral and in and to all proceeds and products thereof against the claims and demands of all Persons whomsoever.

- 18 -

8.4     [Intentionally Omitted]

8.5     <u>Events of Default</u>.  Borrower shall not take or omit to take any action, which act or omission would constitute a Default or an Event of Default.

8.6     <u>Indebtedness</u>.  Borrower shall not create, nor shall they permit to exist any Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except (a) Indebtedness to Lender arising under or as a consequence of this Agreement or the Postpetition Loan Documents, (b) other Indebtedness existing on the Petition Date, (c) unsecured trade payables incurred in the ordinary course, and (d) deferred Taxes.  Borrower shall not at any time suffer to exist a priority for any administrative expense of unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b)) equal or superior to the priority of the Lender in the Bankruptcy Case in respect of the Obligations, except for the Carve-Out.

8.7     <u>Liens</u>.  Borrower shall not create or permit any Liens on any of its properties or assets except the Liens existing as of the Petition Date and the Liens created under this Agreement and the Postpetition Loan Documents.

8.8     <u>Lease Obligations</u>.  Borrower shall not create, incur, or suffer to exist any obligations as lessee (a) for the payment of rent for any real or personal property in connection with any sale and leaseback transaction entered into after the Petition Date, or (b) for the payment of rent for any real or personal property under leases entered into after the Petition Date.

8.9     <u>Use of Loan Proceeds and Carve-Out</u>.  The proceeds of the Loan made hereunder will be used only as set forth in the Budget.  Other than challenging whether an Event of Default has occurred or is continuing, no portion of the Carve-Out or any other proceeds of the Loan may be used:

(a)     to investigate, litigate, object, contest or challenge in any manner or raise any defenses to the debt, claims, offsets or collateral position of Lender under this Agreement, the Postpetition Loan Documents, Prepetition Loan Documents, or any other claims against any of the entities owned or controlled by Lender or its Affiliates, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under this Agreement, the Postpetition Loan Documents, or the Prepetition Loan Documents, or the validity, perfection or priority of any mortgage, pledge, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of Lender under this Agreement, the Postpetition Loan Documents, or the Prepetition Loan Documents;

(b)     commence or prosecute any motion, proceeding or cause of action against any of the Lender, or its agents, attorneys, advisors or representatives;

- 19 -

(c) to seek to (ii) subordinate or recharacterize the Loan or the Prepetition Indebtedness or (ii) disallow any claim, mortgage, pledge, security interest or lien resulting from or granted under this Agreement, the Postpetition Loan Documents or the Prepetition Loan Documents by asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against Lender, or any of its Affiliates, insiders, officers, directors, employees, agents, attorneys, representatives or employees; or

(d) in connection with (i) preventing, hindering or delaying Lender' s enforcement or realization upon the Postpetition Collateral once an Event of Default has occurred, (ii) selling or otherwise disposing of the Postpetition Collateral without the consent of Lender, (iii) using or seeking to use any insurance proceeds related to the Postpetition Collateral without the consent of Lender, or (iv) incurring indebtedness senior to Lender's Liens hereunder.

8.10   Prepetition Payments.  Unless authorized by an order of the Bankruptcy Court and/or as provided in the Budget, Borrower will not (a) make any payment or prepayment on or redemption or acquisition for value of any pre-Petition Date obligations of the Borrower or (b) make any payment or create or permit any Lien pursuant to Bankruptcy Code section 361 (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or apply to the Bankruptcy Court for the authority to do any of the foregoing.

## 9.  TERM.

9.1   Termination.  Subject to the provisions of Section 9 hereof, the Loans provided for under this Agreement shall be in effect from the Closing Date until the Due Date.

9.2   Survival of Obligations and Prepetition Indebtedness upon Termination of Financing Arrangement.  No termination or cancellation of any financing arrangement under this Agreement (regardless of the cause or procedure) shall in any way affect or impair the duties and obligations of Borrower or the rights, including with respect to the Prepetition Indebtedness or under the Prepetition Loan Documents, and powers of Lender relating to any transaction or event occurring prior to such termination, and all claims granted to Lender hereunder shall continue in full force and effect until all Obligations are paid in full.  All undertakings, agreements, covenants, warranties, and representations contained in the Postpetition Loan Documents or the Prepetition Loan Documents, as applicable, shall survive such termination or cancellation and shall continue in full force and effect until such time as all of the Obligations and the Prepetition Indebtedness have been paid in full in accordance with the terms of the Postpetition Loan Documents or the Prepetition Loan Documents, as applicable.

## 10.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES.

10.1   Events of Default.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a) Borrower fails to pay the Loans on the Due Date (whether by acceleration or otherwise) or any other Obligation when due;

- 20 -

13289353v.6

(b)    Borrower breaches, defaults, or fails or neglects to perform, keep or observe any covenant or provision of this Agreement, the Note, or any other Postpetition Loan Document, and the same shall remain unremedied or unwaived for a period ending on the seventh (7th) day after Borrower receives notice from Lender;

(c)    Borrower's expenses for any particular Budget Month exceeds the amount set forth in the Budget by more than the Permitted Variance for the relevant week;

(d)    Borrower shall sell, lease, transfer, convey or otherwise dispose of any of Postpetition Collateral (other than obsolete equipment), except in the ordinary course of business or unless agreed to in writing by Lender;

(e)    Any representation, warranty, certification or statement made by Borrower in this Agreement, any Postpetition Loan Document, or any document to which Borrower and Lender are parties or by Borrower in any certificate, financial statement or other document delivered pursuant hereto or thereto proves to have been incorrect in any material respect when made;

(f)    This Agreement shall cease to be effective to grant a perfected security interest in the Postpetition Collateral with the priority stated to be created thereby or such security interest shall cease to be in full force and effect or shall be declared null or void, or the validity or enforceability of such security interest or this Agreement shall be contested by Borrower;

(g)    After the Notice of Contest Deadline, Debtor or any guarantor of Debtor's Prepetition Indebtedness to Lender challenges or disputes in any manner, the nature, extent or validity of Lender's pre-Petition Date security interests, Liens, or claims against Borrower;

(h)    After the Notice of Contest Deadline, Borrower by motion, adversary action or other means challenges or disputes in any manner, the nature, extent or validity of Borrower's Lien on the Prepetition Collateral or the Postpetition Collateral;

(i)    If Borrower breaches or violates any term of the Orders;

(j)    The Bankruptcy Case shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of the Bankruptcy Case), suspended or converted to a case under Chapter 7 of the Bankruptcy Code, or Borrower shall file any pleading requesting any such relief, or an application shall be filed by Borrower for the approval of, or there shall arise in the Bankruptcy Case, (i) any other claim having priority senior to or *pari passu* with the claims of the Lender under the Postpetition Loan Documents and the Orders or any other claim having priority over any or all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b) (other than the Carve-Out) or (ii) any Lien on the Postpetition Collateral having a priority senior to or *pari passu* with the Liens granted herein, except as expressly provided herein;

(k)    Appointment of a Chapter 11 trustee in the Bankruptcy Case;

- 21 -

(l)    The commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than Borrowers or a Subsidiary, officer or employee of Borrowers, the continuation thereof without dismissal for thirty (30) days after service thereof on Lender, that asserts or seeks by or on behalf of Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, any official committee in the Bankruptcy Case or any other party in interest in the Bankruptcy Case, a claim or any legal or equitable remedy that would (i) have the effect of subordinating any or all of the Obligations or Liens of Lender under the Postpetition Loan Documents to any other claim, or (ii) have a material adverse effect on the rights and remedies of Lender under any Postpetition Loan Document or the collectability of all or any portion of the Obligations;

(m)    The entry of an order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Postpetition Loan Documents; or

(n)    The failure by Borrower and Lender to reach a settlement or agreement with respect to any Notice of Contest, as provided in Section 11.18 hereof.

10.2    <u>Contractual Remedies</u>. Upon the occurrence and during the continuation of an Event of Default (and any applicable cure period as provided in Section 10.1 hereof), subject to Section 10.5 hereof, Lender may, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein:

(a)    increase the rate of interest applicable to the Loan to the Default Rate;

(b)    terminate this Agreement, whereupon all outstanding Obligations will be immediately due and payable, and

(c)    exercise any and all rights and remedies provided under this Agreement and the Postpetition Loan Documents.

10.3    <u>Legal Remedies</u>. Upon the occurrence and during the continuation of an Event of Default and subject to Borrower's rights set forth in Section 10.5 and any cure periods provided herein, Lender may exercise all rights and remedies provided under the Uniform Commercial Code in effect in any applicable jurisdiction and under any other applicable law. The rights and remedies provided for under this Section 10.3 include, *inter alia*, the following:

(a)    The right to take possession of, send notices regarding, and collect directly the Postpetition Collateral, with or without judicial process, and to exercise all rights and remedies available to Lender with respect to the Postpetition Collateral under the Uniform Commercial Code in effect in any jurisdiction in which such Postpetition Collateral is located; and

(b)    The right to (by its own means or with judicial assistance) take possession of the Postpetition Collateral, or render it unusable, or dispose of the Postpetition Collateral on such premises without any liability for rent, storage, utilities, or other sums.

- 22 -

13289353v.6

Except as expressly provided herein, Borrower hereby covenants and agrees that they will not resist or interfere with such actions.

10.4    Payments on Collateral. Without limiting the rights of Lender under any other provision of law or this Agreement, immediately upon and following the occurrence of an Event of Default, all payments received by Borrower under or in connection with any of the Postpetition Collateral shall be held by Borrower in trust for Lender, shall be segregated from other funds of Borrower and shall forthwith upon receipt by Borrower be turned over to Lender, in the same form as received by Borrower (duly indorsed by Borrower to Lender, if required to permit collection thereof by Lender).

10.5    Relief From Stay.

(a)    Upon the occurrence and during the continuation of a Default or Event of Default, Borrower will have the limited right to challenge such occurrence by requesting a hearing before the Bankruptcy Court upon five (5) business days written notice to Lender (the "Default Hearing"). Upon receiving notice of the Default Hearing, and pending the Bankruptcy Court's decision as to whether a Default or Event of Default has occurred, Lender will refrain from exercising its remedies with respect to the Postpetition Collateral and will abide by the terms of any subsequent decision of the Bankruptcy Court.

(b)    Upon the later of (x) the expiration of the five (5) business day period referenced above or (y) the conclusion of the Default Hearing, if any, and unless the Bankruptcy Court finds that no Default or Event of Default has occurred or is continuing:

(i)    Borrower agrees to waive any objection to Lender's request for relief from automatic stay and with respect to the enforcement of its remedies against the Postpetition Collateral under this Agreement and the Postpetition Loan Documents; and

(ii)    shall be irrevocably appointed, with full power of substitution, as Borrower's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in Lender's own name, to take any and all appropriate actions and to execute any and all documents, instruments, and court filings which may be necessary or desirable to liquidate or collect the Postpetition Collateral or otherwise accomplish the purposes of this Agreement.

10.6    Best Efforts and Waivers by Borrower.

(a)    Except as otherwise provided for in this Agreement or by applicable law, Borrower hereby waives: (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, (ii) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing

- 23 -

13289353v.6

Lender to exercise any of its remedies, and (iii) the benefit of all valuation, appraisal, marshaling and exemption laws.

(b)    Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement and the other Postpetition Loan Documents, Borrower shall use its best efforts to assist Lender in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to Lender in its sole discretion.

## 11. MISCELLANEOUS.

11.1    No Liability.  In making decisions to advance moneys or extend financial accommodations of any nature under the Orders or this Agreement, Borrower agrees that Lender is not (a) in control of the operations of Borrower, (b) an "employer" of any of Borrower's employees, or (c) acting as a "responsible person" or managing agent with respect to the operation or management of Borrower.

11.2    Complete Agreement.  This Agreement and the Postpetition Loan Documents shall constitute the complete agreement between the parties with respect to the subject matter hereof and may not be modified, altered or amended except by an agreement in writing signed by Borrower and Lender, with any material modification, alteration, or amendment approved by the Bankruptcy Court after notice and a hearing.

11.3    Sale of Interests.  Borrower may not sell, assign, or transfer this Agreement or any of the Postpetition Loan Documents or any portion thereof, including, *inter alia*, Borrower's duties and obligations thereunder.  Borrower hereby consents to Lender's sale of participation, assignment, transfer or other dispositions, at any time or times, of any of the Postpetition Loan Documents or of any portion thereof or interest therein, including, *inter alia*, Lender's rights, title, interest, remedies, powers, or duties thereunder, whether evidenced by a writing or not.

11.4    Modification of Agreement.  No amendment or waiver of any provision of this Agreement, the Note, or any other Postpetition Loan Document, nor consent to any departure by Lender therefrom, shall in any event be effective unless the same shall be in writing and signed by each of Lender and Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

11.5    Parties Including Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Postpetition Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Postpetition Loan Document shall be binding upon Borrower, the estates of Borrower, and any trustee(s), other estate representative(s) or any successor in interest of Borrower in the applicable chapter 11 case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Bankruptcy Code section 365. This Agreement and the other Postpetition Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Postpetition Loan Documents shall be and remain valid and perfected in the event of substantive consolidation or conversion of the Bankruptcy Case or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Bankruptcy Case or the release of any

- 24 -

Postpetition Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its Liens under applicable law. Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Postpetition Loan Documents without the prior express written consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without the prior express written consent of Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrower and Lender with respect to the transactions contemplated hereby and no Person shall be a third-party beneficiary of any of the terms and provisions of this Agreement or any of the other Postpetition Loan Documents.

11.6    No Waiver by Lender. The failure of Lender at any time to require strict performance by Borrower of any provision of this Agreement, the Note, or any other Postpetition Loan Document shall not waive, affect, or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Lender of a default or Event of Default by Borrower under this Agreement, the Note, or any other Postpetition Loan Documents shall not suspend, waive, or affect any other default or Event of Default by Borrower under this Agreement, the Note, or any other Postpetition Loan Document whether the same are prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants, and representations of Borrower contained in this Agreement shall be deemed to have been suspended or waived by Lender, unless such suspension or waiver is by an instrument in writing signed by Lender and directed to Borrower specifying such suspension or waiver.

11.7    Additional Remedies. Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that Lender may have under any other agreement, including, *inter alia*, any Postpetition Loan Document, the Bankruptcy Code, by operation of law, or otherwise. This Agreement is without prejudice to any rights of Lender under the Bankruptcy Code, with respect to the Prepetition Indebtedness or under the Prepetition Loan Documents, or under applicable non-bankruptcy law.

11.8    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.9    Conflict of Terms. Except as otherwise provided in this Agreement or the Note by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in the Note, the provision contained in this Agreement shall govern and control.

11.10    Governing Law; Litigation. Except as otherwise expressly provided in any of the Postpetition Loan Documents, in all respects, including all matters of construction, validity and performance, this Agreement and the Obligations arising hereunder shall be governed by, and be construed and enforced in accordance with, the laws of the State of Illinois applicable to

- 25 -

13289353v.6

contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws, and any applicable laws of the United States of America.

11.11   Waiver of Jury Trial.   Borrower hereby waives trial by jury in any action or proceeding of any kind or nature in any court in which an action may be commenced arising out of this Agreement or any assignment thereof or by reason of any other cause or dispute whatsoever between them of any kind or nature.

11.12   Confession of Judgment.   If the Bankruptcy Case is dismissed or if an Event of Default exists with respect to this Agreement that is not cured or waived, Borrower hereby authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower and to confess judgment against Borrower in favor of Lender in the full amount of the Obligations owing in connection with this Agreement and the Note (including principal, accrued interest and reasonable attorneys' fees and court costs and any and all charges, fees and costs).   Borrower agrees and consents that venue and jurisdiction will be proper in any court sitting in the State of Illinois.   Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, homestead rights, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment.   The authority and power to appear for and enter judgment against Borrower will not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and will not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as Lender will deem necessary, convenient, or proper.

11.13   Notices.   Except as otherwise provided herein, whenever it is provided in this Agreement that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be delivered in person by electronic transmission, or facsimile addressed as follows:

      (a)     If to Borrower, at the following addresses:

             Scott R. Clar (sclar@craneheyman.com)
             Crane, Heyman, Simon, Welch & Clar
             135 S. LaSalle, Suite 3705
             Chicago, Illinois 60603
             Facsimile: (312) 641-6777

      (b)     If to Lender, at the following addresses:

             Jason J. DeJonker (jdejonker@seyfarth.com)
             Gus A. Paloian (gpaloian@seyfarth.com)
             Seyfarth Shaw LLP
             131 South Dearborn Street, Suite 2400

13289353v.6

Chicago, IL 60603-5577
Facsimile: (312) 460-7220

11.14  [Intentionally Omitted]

11.15  Survival.  The representations and warranties of Borrower in this Agreement shall survive the execution, delivery and acceptance hereof by the parties hereto and the closing of the transactions described herein or related hereto.

11.16  Section Titles.  The Bankruptcy Code section titles and table of contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever.

11.17  Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement.

11.18  Prepetition Indebtedness and Prepetition Loan Documents.

(a)    Promptly upon entry of the Interim DIP Order, Borrower shall review the Prepetition Loan Documents and any other information reasonably requested by Borrower from Lender to determine (i) the validity of the claims asserted by Lender with respect to the Prepetition Indebtedness, and (ii) the validity and perfection of the Prepetition Liens.  Lender shall cooperate in good faith with any requests by Borrower for additional information necessary for Borrower to conduct due diligence with respect to such matters.

(b)    To the extent Borrower contests the amount of the Prepetition Indebtedness or the validity or perfection of the Prepetition Liens, Borrower shall provide Lender with written notice (a "Notice of Contest") of any specific issues contested by Borrower with respect to the Prepetition Indebtedness or the Prepetition Liens.  Borrower shall provide such notice within thirty (30) days of the entry by the Bankruptcy Court of the Interim Order ("Notice of Contest Deadline") and shall serve such notice on the United States Trustee.

(c)    To the extent the parties reach agreement with respect to those issues raised in the Notice of Contest, Borrower and Lender shall promptly submit any such agreement to the Bankruptcy Court for approval.  The failure by Borrower and Lender to reach agreement with respect to those issues raised in the Notice of Contest within ten (10) days of Borrower's issuance of such notice shall constitute an Event of Default hereunder, and Borrower and Lender shall reserve all rights with respect to any future proceeding or matter related to the validity or perfection of the Prepetition Indebtedness or Prepetition Liens.

(d)    To the extent Borrower does not issue a Notice of Contest by the Notice of Contest Deadline, than Borrower shall have presumptively agreed, and covenanted, represented and warranted to Lender as of the date hereof, that:

(i)    Each of the Prepetition Loan Documents has been duly authorized, executed and delivered by Borrower, and each of the Prepetition Loan Documents constitutes a valid and legally binding obligation enforceable against Borrower;

- 27 -

(ii)    Each of the Prepetition Loan Documents remains in full force and effect as originally executed and delivered by the parties;

(iii)    All Prepetition Indebtedness and all other obligations and liabilities of Borrower under the Prepetition Loan Documents continue to be due and owing to Lender, without any counterclaims, setoffs or defenses of any kind or nature whatsoever to the enforcement by Lender;

(iv)    Through and including the Petition Date, there was due and owing under the Prepetition Loan Documents, in addition to any and all other costs, incurred or to be incurred by Lender in connection with the Prepetition Loan Documents or the Prepetition Indebtedness, the principal amount of five million three hundred twelve thousand nine hundred seventy-five dollars and 79/100 ($5,312,975.79) and interest of two hundred forty-three thousand eight hundred one dollars and 63/100 ($243,801.63);

(v)    Repayment of the Prepetition Indebtedness, the loans, and the extensions of credit under the Prepetition Loan Documents are secured by the Prepetition Liens, which are valid, properly perfected, first-priority security interests and Liens in and to the Prepetition Collateral; and

(vi)    Lender has (x) fully performed all obligations to Borrower that it may have had or has on and as of the Petition Date under the Prepetition Loan Documents and (y) subject to the automatic stay under Bankruptcy Code section 362(a), the immediate right to pursue all of its remedies under the Prepetition Loan Documents.

**[Intentionally Left Blank]**

13289353v.6

IN WITNESS WHEREOF, this Agreement have been duly executed as of the date first written above.

CHAMPION ENVIRONMENTAL SERVICES, INC., DEBTOR AND DEBTOR-IN-POSSESSION

BY: _____
NAME: _____
TITLE: _____


FIRSTMERIT BANK, N.A.

BY: _____
NAME: _____
TITLE: _____

[Signature Page to Postpetition Senior Secured Loan Agreement]

**EXHIBIT A**

**NOTE**

13289353v.6

## PROMISSORY NOTE

$400,000.00

Chicago, Illinois
April 20, 2011

FOR VALUE RECEIVED, the undersigned CHAMPION ENVIRONMENTAL
SERVICES, INC., a Wisconsin corporation and debtor-in-possession under Chapter 11
("Borrower") promises to pay to the order of the FIRSTMERIT BANK, N.A. ("Lender"), the
principal sum of four hundred thousand dollars ($400,000.00), or such lesser principal amount as
may be then outstanding, on the dates and in the amounts set forth in the Loan Agreement (as
defined below), together with interest on the unpaid principal amount hereof, at the rates and on
the dates set forth in that certain Postpetition Senior Secured Loan Agreement, dated of even date
herewith, between Borrower and Lender (herein, as the same may be amended, modified,
restated or supplemented from time to time, called the "Loan Agreement").  All capitalized terms
not defined herein shall have the meanings ascribed to them in the Loan Agreement.  If not
sooner paid, Borrower shall pay the principal of and accrued and unpaid interest on the Loan in
full on the Due Date.

Payments of both principal and interest are to be made in the lawful money of the United
States of America in immediately available funds at Lender's principal office at 501 West North
Avenue, Melrose Park, Illinois 60160, or at such other place as may be designated by Lender to
Borrower in writing.

This Promissory Note (the "Note") evidences indebtedness incurred under and is subject
to the terms and provisions of Loan Agreement, including those under which this Note may or
must be paid prior to its due date or may have its due date accelerated; provided, that this Note
may be prepaid in whole or in part without premium or penalty.  This Note is secured by the
property described in and pursuant to the Loan Agreement and other documents referred to
therein, and reference is made thereto for a statement of terms and provisions of such collateral
security, a description of collateral and the rights of Lender in respect thereof.

All parties hereto, whether as makers, endorsers or otherwise, severally waive
presentment, demand, protest and notice of dishonor in connection with this Note.

Borrower waives the benefit of any law that would otherwise restrict or limit Lender in
the exercise of its right, which is hereby acknowledged, to set-off against the Obligations,
without notice and at any time hereafter, any indebtedness matured or unmatured owing from
Lender to Borrower.

This Note is binding upon Borrower and its successors and assigns, and shall inure to the
benefit of Lender and its successors and assigns.  This Note is made under and governed by the
laws of the State of Illinois without regard to conflict of laws principles.

The ownership of an interest in this Note shall be registered on a record of ownership
maintained by Borrower or its agent.  Notwithstanding anything else in this Note to the contrary,
the right to the principal of, and stated interest on, this Note may be transferred only if the
transfer is registered on such record of ownership and the transferee is identified as the owner of

13289353v.6

an interest in the obligation.  Borrower shall be entitled to treat the registered holder of this Note (as recorded on such record of ownership) as the owner in fact thereof for all purposes and shall not be bound to recognize any equitable or other claim to, or interest in, this Note on the part of any other person or entity.

[Signature Page Follows]

2

IN WITNESS WHEREOF, Borrower has executed this Note on the date above set forth.

CHAMPION ENVIRONMENTAL SERVICES,
INC., DEBTOR AND DEBTOR-IN-POSSESSION

BY: _____

NAME: _____

TITLE: _____

[Signature Page to Promissory Note]

## SCHEDULE 1

## BUDGET

13289353v.6

Champion Environmental Services
Budget

| | Wk End 4/22/11 | Wk End 4/29/11 | Wk End 5/6/11 | Wk End 5/13/11 | Wk End 5/20/11 | Wk End 5/27/11 | Wk End 6/3/11 | Wk End 6/10/11 | Wk End 8/17/11 | Wk End 6/24/11 | Wk End 7/1/11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | | | | | | | |
| *Jobs-to-Complete Receipts:* | | | | | | | | | | | | |
| Lapham Park | - | - | - | - | - | - | - | - | - | 117,033 | - | 117,033 |
| Ecology Bldg | - | - | - | - | - | - | 123,020 | - | - | - | - | 123,020 |
| Sheffield School | - | - | - | - | - | - | - | - | - | - | 204,406 | 204,406 |
| Genecor | - | - | - | - | - | - | 95,350 | - | - | - | - | 95,350 |
| Kenosha Hotel | - | - | - | - | 139,000 | - | - | - | - | - | - | 139,000 |
| **Jobs-to-Complete Receipts** | - | - | - | - | 139,000 | - | 218,370 | - | - | 117,033 | 204,406 | 678,809 |
| *Other Receipts:* | | | | | | | | | | | | |
| Health Ins. - Cobra EE refund | 1,618 | - | 1,500 | - | - | - | 1,000 | - | - | - | - | 4,118 |
| Refund of G/L & Umbrella Ins. Premium | - | - | - | - | - | - | - | - | - | - | - | - |
| P&H Mining Job - Check at CES | 36,515 | - | - | - | - | - | - | - | - | - | - | 36,515 |
| Chicago State Job - Check at CES | 10,832 | - | - | - | - | - | - | - | - | - | - | 10,832 |
| Insurance Claim - Check at CES - Repair Excavator at Fabco | 16,485 | - | - | - | - | - | - | - | - | - | - | 16,485 |
| Insurance Claim - Check at CES | 1,000 | - | - | - | - | - | - | - | - | - | - | 1,000 |
| Health Ins.- May Premium, Partial Refund | - | - | - | - | - | - | - | 4,000 | - | - | - | 4,000 |
| W/C Ins. - Premium Refund | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Other Receipts** | 66,450 | - | 1,500 | - | - | - | 1,000 | 4,000 | - | - | - | 72,950 |
| **Total Receipts** | 66,450 | - | 1,500 | - | 139,000 | - | 219,370 | 4,000 | - | 117,033 | 204,406 | 751,759 |
| **Disbursements:** | | | | | | | | | | | | |
| *Jobs-to-Complete Exp's:* | | | | | | | | | | | | |
| *Jobs-to-Complete: Payroll & Benefits:* | | | | | | | | | | | | |
| Gross Payroll - Jobs-to-Complete | - | - | 18,224 | 11,586 | 7,040 | 4,720 | - | - | - | - | - | 41,570 |
| Benefits on Jobs-to-Complete Payroll | - | - | 8,800 | 4,640 | 3,200 | 2,400 | - | - | - | - | - | 19,040 |
| **Total Payroll & Benefits - Jobs-to-Complete** | - | - | 27,024 | 16,226 | 10,240 | 7,120 | - | - | - | - | - | 60,610 |
| *Jobs-to-Complete: Operating Exp's (Excluding Payroll):* | | | | | | | | | | | | |
| Job costs - Lapham Park | - | - | 1,000 | 600 | - | - | - | - | - | - | - | 1,600 |
| Job costs - Ecology Bldg | - | 1,000 | - | - | - | - | - | - | - | - | - | 1,000 |
| Job costs - Sheffield School | - | - | 3,000 | 3,000 | 3,000 | 34,750 | - | - | - | - | - | 43,750 |
| Job costs - Genecor | - | 3,900 | - | - | - | - | - | - | - | - | - | 3,900 |
| Job costs - Kenosha Hotel | - | - | 11,000 | 600 | - | - | - | - | - | - | - | 11,600 |
| **Total Operating Expenses - Jobs-to-Complete** | - | 4,900 | 15,000 | 4,200 | 3,000 | 34,750 | - | - | - | - | - | 61,850 |
| *Jobs-to-Complete: Pre-Petition Accts Payable:* | | | | | | | | | | | | |
| **Total Pre-Petition Accts Payable - Jobs-to-Complete** | - | - | - | - | 13,117 | - | 56,507 | - | - | 27,545 | 61,603 | 158,773 |
| **Total Jobs-to-Complete Costs** | - | 4,900 | 42,024 | 20,426 | 26,357 | 41,870 | 56,507 | - | - | 27,545 | 61,603 | 281,233 |
| **Administrative Costs:** | | | | | | | | | | | | |
| *Pre-Petition Unpaid Payroll:* | | | | | | | | | | | | |
| Gross Payroll - W/E 3/18 | 22,670 | - | - | - | - | - | - | - | - | - | - | 22,670 |
| Gross Payroll - W/E 3/25 | 35,878 | - | - | - | - | - | - | - | - | - | - | 35,878 |
| Gross Payroll - W/E 4/1 | 27,043 | - | - | - | - | - | - | - | - | - | - | 27,043 |
| **Total Pre-Petition Unpaid Payroll** | 85,591 | - | - | - | - | - | - | - | - | - | - | 85,591 |
| *Benefits Payable on Pre-Petition Unpaid Payroll:* | | | | | | | | | | | | |
| Local 139 Benefits on 3/18 to 4/1 Payroll | 7,343 | - | - | - | - | - | - | - | - | - | - | 7,343 |
| Local 225 Benefits on 3/18 to 4/1 Payroll | 8,288 | - | - | - | - | - | - | - | - | - | - | 8,288 |
| **Total Benefits Payable on Pre-Petition Unpaid Payroll** | 15,631 | - | - | - | - | - | - | - | - | - | - | 15,631 |
| *Admin Post-Petition Payroll:* | | | | | | | | | | | | |
| Dominic Gorniak | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | - | 15,000 |
| Kathy Lopez (Office) | 4,375 | 2,188 | 2,188 | 2,188 | 2,188 | 2,188 | 2,188 | 1,250 | 1,250 | 1,250 | - | 21,250 |
| Lorna Brederhon (Office) | 4,375 | 2,188 | 2,188 | 2,188 | 2,188 | 2,188 | 2,188 | - | - | - | - | 17,500 |
| Mike Krueger (Mechanic) | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 | - | - | - | - | - | 7,212 |
| Girado Madrid (Warehouse) | 990 | 990 | 990 | 990 | 990 | 990 | - | - | - | - | - | 5,940 |
| ER Payroll Taxes | 1,532 | 919 | 919 | 919 | 919 | 919 | 613 | - | - | - | - | 6,741 |
| Lorna Brederhon - Auto Allowance | 600 | - | 800 | - | - | - | - | - | - | - | - | 1,400 |
| **Total Admin Post-Petition Payroll** | 14,574 | 8,986 | 9,786 | 8,986 | 8,986 | 8,986 | 6,488 | 2,750 | 2,750 | 2,750 | - | 75,043 |
| *Office Expenses:* | | | | | | | | | | | | |
| ComEd - 4/7 (thru 3/23) | 600 | - | 600 | - | - | - | - | - | - | - | - | 1,200 |
| NiCor - due 3/25 ($1,045; $1,018 thru 3/9) | 2,063 | 1,000 | - | - | - | 1,000 | - | - | - | - | - | 4,063 |
| Telephone - 4/1 - $550 thru 2/28 | 282 | - | 600 | - | - | - | - | - | - | - | - | 882 |
| Sprint - $2k by Fri - pymt plan | 4,500 | - | - | - | - | - | - | - | - | - | - | 4,500 |
| Just Network - $500k per week | 2,000 | 500 | 500 | 500 | 500 | 500 | - | - | - | - | - | 4,500 |
| Ikon - Copier. $370/mo will work | 370 | - | - | 370 | - | - | - | - | - | - | - | 740 |
| UPS & Postage | 90 | 90 | 60 | 60 | 60 | 60 | - | - | - | - | - | 420 |
| Other | 1,500 | 1,500 | 1,000 | 1,000 | 1,000 | 1,000 | - | - | - | - | - | 7,000 |
| **Total Office Expenses** | 11,405 | 3,090 | 2,760 | 1,930 | 1,560 | 2,560 | - | - | - | - | - | 23,305 |

Champion Environmental Services
Budget

| | Wk End 4/22/11 | Wk End 4/29/11 | Wk End 5/6/11 | Wk End 5/13/11 | Wk End 5/20/11 | Wk End 5/27/11 | Wk End 6/3/11 | Wk End 6/10/11 | Wk End 6/17/11 | Wk End 6/24/11 | Wk End 7/1/11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Payables - Operating Expenses:* | | | | | | | | | | | | |
| Union 139 - Prior Month Benefits | - | - | - | - | - | - | - | - | - | - | - | - |
| Union 139 - Monthly Agreement | - | - | - | - | - | - | - | - | - | - | - | - |
| Health Insurance | 9,837 | - | - | 6,392 | - | - | - | - | - | - | - | 16,229 |
| Auto Ins. - Century National | 4,635 | 4,635 | - | - | 4,635 | - | - | - | - | 4,635 | - | 18,540 |
| W/C Ins. - WI | 7,392 | 7,392 | - | - | 7,392 | - | - | - | - | - | - | 22,176 |
| W/C Ins. - IL | 2,521 | 2,521 | - | - | 2,521 | - | - | - | - | - | - | 7,563 |
| Inland Marine | 2,226 | 2,226 | - | 2,226 | - | - | - | - | - | - | - | 6,678 |
| Life Ins - Dominick. Mar is returned | 1,157 | - | 1,157 | - | - | 1,157 | - | - | - | - | - | 3,471 |
| General Liability Insurance | 9,170 | - | - | - | - | - | - | - | - | - | - | 9,170 |
| Umbrella Insurance | 10,995 | - | - | - | - | - | - | - | - | - | - | 10,995 |
| Ryder Tractors (2) | 7,500 | - | 5,000 | - | - | 2,500 | - | - | - | - | - | 15,000 |
| LowBoy Trailer | 2,262 | - | 1,131 | - | - | - | - | - | - | - | - | 3,393 |
| Fuel for Van (Girardo) | 300 | 300 | 300 | 300 | 300 | 300 | | | | | | 1,800 |
| ***Total Payables - Operating Exp's*** | 57,995 | 17,074 | 7,588 | 8,918 | 14,848 | 3,957 | - | - | - | 4,635 | - | 115,015 |
| | | | | | | | | | | | | |
| *Professional Fees:* | | | | | | | | | | | | |
| Debtor Attorney | - | - | - | 25,000 | - | - | - | - | - | - | - | 25,000 |
| Auctioneer | - | - | - | - | - | - | - | - | - | - | - | - |
| Tax Accountant - Corporate Income Taxes - 4 Years | - | - | - | - | - | - | - | - | - | - | - | - |
| ***Total Professional Fees*** | - | - | - | 25,000 | - | - | - | - | - | - | - | 25,000 |
| | | | | | | | | | | | | |
| *Equipment Costs:* | | | | | | | | | | | | |
| Move Equipment from Job Sites - Fuel | 200 | 200 | 200 | 200 | 200 | 200 | - | - | - | - | - | 1,200 |
| Repair - Excavator at Fabco | - | 15,000 | - | - | - | - | - | - | - | - | - | 15,000 |
| Repair - Excavator w/ engine out | - | 7,000 | - | - | - | - | - | - | - | - | - | 7,000 |
| Ready for Sale - Paint, Replace Panels & Windows, Clean Cabs | - | 21,000 | 14,000 | 7,000 | 7,000 | 7,000 | - | - | - | - | - | 56,000 |
| ***Total Equipment Costs*** | 200 | 43,200 | 14,200 | 7,200 | 7,200 | 7,200 | - | - | - | - | - | 79,200 |
| | | | | | | | | | | | | |
| *Other:* | | | | | | | | | | | | |
| ***Total Other*** | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| **Total Disbursements** | 185,396 | 77,250 | 76,358 | 72,460 | 58,952 | 64,573 | 62,995 | 2,750 | 2,750 | 34,930 | 61,603 | 700,018 |
| | | | | | | | | | | | | |
| **Net Cash Flow** | (118,946) | (77,250) | (74,858) | (72,460) | 80,048 | (64,573) | 156,376 | 1,250 | (2,750) | 82,103 | 142,803 | 51,741 |
| | | | | | | | | | | | | |
| **Cumulative Net Cash Flow** | (118,946) | (196,196) | (271,055) | (343,515) | (263,467) | (328,040) | (171,665) | (170,415) | (173,165) | (91,062) | 51,741 | |
| | | | | | | | | | | | | |
| ***DIP Loan:*** | | | | | | | | | | | | |
| Beginning Balance | - | 118,946 | 196,196 | 271,055 | 343,515 | 263,467 | 328,040 | 171,665 | 170,415 | 173,165 | 91,062 | |
| Net Cash Flow | 118,946 | 77,250 | 74,858 | 72,460 | (80,048) | 64,573 | (156,376) | (1,250) | 2,750 | (82,103) | (142,803) | |
| Ending Balance | 118,946 | 196,196 | 271,055 | 343,515 | 263,467 | 328,040 | 171,665 | 170,415 | 173,165 | 91,062 | (51,741) | |